IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| MARCUS DEANGELO CHALMERS, | ) | CIVIL ACTION NO. 9:16-644-RMG-BM |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner wherein he was denied disability benefits.

This case was referred to the undersigned for a report and recommendation pursuant to Local Civil

Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) on November 7, 2011,

alleging disability beginning February 15, 2011 due to shoulder/neck pain, arthritis in his shoulder,

back problems, and high blood pressure. (R.pp. 15, 173, 197). Plaintiff's claim was denied both

initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law

Judge (ALJ), which was held on June 3, 2014. (R.pp. 32-80). The ALJ thereafter denied Plaintiff's

claim in a decision issued October 15, 2014. (R.pp. 15-26). The Appeals Council denied Plaintiff's

request for a review of the ALJ's decision, thereby making the determination of the ALJ the final

decision of the Commissioner. (R.pp. 1-5).



Plaintiff then filed this action in United States District Court. Plaintiff asserts that the ALJ's decision is not supported by substantial evidence, and that the decision should be remanded for further consideration and a new decision. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

**Scope of review**

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>Richardson v. Califano</u>, 574 F.2d 802, 803 (4th Cir. 1978); <u>Myers v. Califano</u>, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

<u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws v. Celebrezze</u>, 368 F.2d 640 (4th Cir. 1966)); <u>see</u> <u>also</u>, <u>Hepp v. Astrue</u>, 511 F.3d 798, 806 (8th cir. 2008)[Noting that the substantial evidence standard is "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. <u>Laws</u>, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court



2

disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## Medical Records

Plaintiff's medical records reveal that Dr. Lee Patterson of Carolina Bone and Joint Clinic performed a left shoulder arthroscopy with debridement of Plaintiff's left (dominant) shoulder on August 22, 2007. (R.pp. 509-511).[1] This was three and a half (3 ½) years before Plaintiff alleges he became disabled. On February 22 and 27, 2010, Plaintiff was treated in the emergency room at Self Regional Healthcare for complaints of headache and low back pain after a motor vehicle accident. CT scans without contrast were noted to be normal (February 22, 2010) and unremarkable (February 27, 2010). (R.pp. 293-297, 308-315).

On February 15, 2011 (the date Plaintiff alleges he became disabled), Plaintiff was injured in another motor vehicle accident and was treated for left shoulder pain and fractured ribs at Self Regional. CT scans (with contrast) of Plaintiff's abdomen and pelvis, chest, and head showed possible non-displaced fractures of his right ninth and tenth posterior ribs with adjacent atelectasis as well as bullous emphysematous changes in the right apex of his lung with faint nodular densities in the right apex for which follow-up was needed to ensure stability. However, a CT scan (with contrast) of Plaintiff's head showed no acute intracranial abnormalities, while an x-ray of his shoulder showed no fracture or subluxation. Plaintiff was discharged the same day and cleared to return to work on February 17, 2011 with no limitations. (R.pp. 326-339, 518).

---

[1]Plaintiff testified that he is left-handed. (R.p. 40).



On February 25, 2011, Plaintiff received follow up treatment with Dr. Vincent S. Toussaint for residuals of his motor vehicle accident. (R.p. 561). Plaintiff continued to complain to Dr. Toussaint of left shoulder pain on March 7, 2011. (R.p. 558). On March 11, 2011, he reported that his left shoulder pain had not improved and that he also had chest pain. (R.p. 558). On March 16, 2011, Plaintiff complained of numbness down his left arm while sleeping, and Dr. Toussaint noted that Plaintiff had decreased range of motion. (R.p. 557). On March 21, 2011, Dr. Toussaint referred Plaintiff to an orthopedist. (R.p. 556).

On April 14, 2011, Dr. William S. Owens, Jr. of Palmetto Bone and Joint examined Plaintiff for complaints of left shoulder injury with pain in his neck and pain and numbness radiating down his left upper extremity into his entire hand. Examination revealed that Plaintiff had no tenderness at the SC joint, but his neck pain and some of his left upper extremity pain was reproduced with motion in his neck and he had tenderness at the AC joint and the anterior lateral aspect of the acromion, some pain with passive motion of his shoulder, pain throughout the impingement region with cross chest adduction, essentially full range of motion of his shoulder, and hyporeflexia in his cervical spine (C5, 6, and 7). Dr. Owens' impression was left shoulder and arm pain, and he ordered an EMG and an MRI of Plaintiff's shoulder. (R.p. 416). An MRI of Plaintiff's left shoulder was then performed on April 27, 2011, which indicated the presence of a moderate-sized bone contusion of the distal clavicle at the AC joint with accompanying sprain of Plaintiff's shoulder ligaments. (R.p. 417).

On May 5, 2011, he was examined by Dr. Daniel Sheehan at Palmetto Bone and Joint. Cervical range of motion testing reproduced neck pain, and Plaintiff complained of discomfort with attempted range of motion of the left shoulder, tenderness of the left AC joint, absent deep tendon



reflexes in the bilateral upper extremities, atrophy of the thenar eminence, mild tenderness of the left volar wrist, and left shoulder pain with crossed adduction of his left shoulder. Plaintiff also complained of pain and paresthesias in the peri-scapular muscles. Dr. Sheehan opined that the electrodiagnostic findings and clinical assessment were consistent with cervical radiculopathy affecting the C5 and C6 nerve root distributions on the left, mild/moderately severe median neuropathy at the left wrist, mild ulnar neuropathy at the left elbow, and rib fractures. Plaintiff planned to follow up with Dr. Toussaint regarding further evaluation of his rib fractures and the chest CT scan, and to follow up with Dr. Owens regarding further management of his neck, shoulder, and left upper extremity symptoms. (R.pp. 415, 421).

Plaintiff saw Dr. Owens on May 11, 2011. On examination Plaintiff complained of tenderness at the distal clavicle and AC joint; he had good range of motion of his elbow; was a bit tender at the ulnar nerve at the cubital tunnel but had negative Froment and Wartenberg signs; he had positive Tinel and Phalen signs at the carpal tunnel but was negative at the pronator region; and he had full filling of his hand from the radial and ulnar arteries. Dr. Owens' impression was EMG documented left C5-6 radiculopathy, left carpal tunnel syndrome, early left cubital tunnel syndrome, and left AC sprain. He injected Plaintiff's AC joint; set up a cervical spine MRI, and indicated that Plaintiff was to have an epidural at C5-6 following the MRI. (R.p. 414). However, on May 25, 2011, Dr. Owens noted that worker's compensation would not approve the cervical MRI, and he did not think there was anything he could do until Plaintiff's neck situation was resolved. (R.p. 413). Plaintiff thereafter returned to Dr. Owens on August 24, 2011 with complaints of left shoulder pain. Examination indicated that the majority of Plaintiff's pain was at the AC joint, and x-rays revealed post-traumatic arthritic changes. It was noted that worker's compensation wanted Dr. Owens to deal



only with Plaintiff's left shoulder injury. Plaintiff requested narcotic pain medication, but Dr. Owens said it would be inappropriate at that stage of treatment. He did, however, give Plaintiff an injection in his shoulder. (R.p. 412).

On September 16, 2011 (now seven months post his February 2011 motor vehicle accident), an MRI of Plaintiff's cervical spine revealed multilevel cervical spondylosis with no significant area of spinal canal or neural foraminal compromise. There was also normal signal intensity within the spinal cord. (R.pp. 281-282). On September 20, 2011, Dr. Michael N. Bucci of Piedmont Spine and Neurosurgical Group noted that an MRI of Plaintiff's cervical spine showed no areas of significant stenosis or disc herniation, although an EMG was suggestive of radiculopathy. Plaintiff complained of left neck pain radiating to his left hand with numbness and a cold sensation in his hand, and that lifting aggravated his symptoms. However, an examination revealed that Plaintiff had normal tone, strength, reflexes, coordination, and gait. It was also noted that Plaintiff had an appropriate fund of knowledge, no attention deficit, no impairment of concentration, no impairment of global orientation, and no impairment in his long or short term memory. Plaintiff was assessed with cervical DDD, neck pain - cervicalgia, ligament strain or sprain, and cervical radiculopathy. He was instructed to follow up as needed and was referred to the Carolina Center for Advanced Pain. (R.pp. 283-285).

On September 21, 2011, Plaintiff reported to Dr. Owens that the AC joint injection had temporarily improved his symptoms, but that his pain had reoccurred. Physical examination revealed that essentially all of Plaintiff's complained of pain was in his AC joint. He had no pain with passive motion of his shoulder. Dr. Owens discussed various treatment options, and Plaintiff elected to proceed with a distal clavicle excision. (R.p. 411).



Plaintiff then sought treatment at Self Regional for chest pain on October 19, 2011. A chest x-ray performed at that time showed what appeared to be a normal chest and heart. (R.p. 361). On October 21, 2011, an exercise stress test indicated that Plaintiff's resting ECG was normal with a heart rate of 70 beats per minute. During exercise, the ECG showed sinus tach, but no ischemic changes, and returned to baseline during the exercise recovery phase. Plaintiff had a good exercise tolerance, normal ECG component of standard Bruce protocol treadmill study, and hypertensive response to exercise. (R.pp. 370-371, 465-466). On October 25, 2011, it was noted that post-stress SPECT images showed abnormal myocardial perfusion with ischemia in the inferior and inferolateral segments and a mildly reduced LVEF of 49%. (R.pp. 371, 466).

On October 24, 2011, Dr. Owens performed a left distal clavicle excision. (R.p. 423). At a follow up appointment with Dr. Owens on November 2, 2011, Plaintiff's wounds had healed nicely and radiographs indicated an adequate level of acromial plasty. Plaintiff was to begin therapy for passive range of motion of his shoulder. (R.p. 410). Plaintiff thereafter underwent physical therapy, but no formal reassessment was completed because Plaintiff cancelled his last treatment session due to reported cardiac problems. Review of Plaintiff's chart indicated that passive range of motion was full in all planes, but that Plaintiff continued to complain of 5-7/10 pain with functional use of his shoulder. (R.p. 426).

Plaintiff was treated at the Good Shepherd Free Clinic (GSFC) on December 6, 2011 for complaints of chest pain accompanied by numbness in his left arm, shoulder, and neck. He was diagnosed with unspecified hypertension, and blood pressure medication was prescribed. (R.pp. 482-483).



On January 6, 2012, Plaintiff underwent a physical examination and a heart catheterization. Plaintiff complained of chest pain radiating to his neck with numbness in his arm over the previous six months, worsening angina with daily episodes, and an abnormal nuclear cardiology study. However, on examination Plaintiff was determined to be in no acute distress; he was fully oriented; had clear lungs; and his gait, motor function, and sensory function were all grossly intact. (R.pp. 447-448). A diagnostic left cardiac catheterization the same day indicated that Plaintiff's chest pain was non-cardiac in origin, and it was noted that Plaintiff likely had a false positive nuclear cardiology study. The conclusion was that Plaintiff had overall normal coronaries with normal LV systolic function. (R.pp. 442-443). Even so, he was given a diagnosis of unstable angina with inferior wall ischemia and systemic hypertension. (R.pp. 447-448). On January 19, 2012, Plaintiff followed up with Nurse Practitioner Angela Mearns regarding the cardiac catheterization, at which time medication for hypertension was prescribed and Plaintiff was instructed to follow up in one year. (R.pp. 452-453).

On February 9, 2012, state agency physician Dr. Ted Roper reviewed Plaintiff's medical records and history and opined that Plaintiff had the physical capacity to occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; sit, stand, and walk for six hours in an eight-hour workday; frequently climb ramps and stairs, balance, stoop, and crawl; and frequently reach overhead on the left. He further opined that Plaintiff should avoid concentrated exposure to hazards. (R.pp. 86-88).

On March 14, 2012, Plaintiff complained to providers at GSFC that he had swelling in his extremities, cramps in his legs, and shortness of breath with exertion. He was diagnosed with hypertension and respiratory system disease, and medication for hypertension and neck spasms was



prescribed. (R.pp. 480-481). On March 20, 2012, a pulmonary function analysis showed a minimal obstructive lung defect with an insignificant response to a bronchodilator, although it was noted that more detailed pulmonary function testing might be useful. (R.pp. 486-487). On April 25, 2012, a provider at GSFC diagnosed tobacco use disorder and wheezing, and a bronchodilator was prescribed. (R.pp. 499-500).

On December 14, 2012, state agency physician Dr. Richard Whitney reviewed Plaintiff's medical records and history and opined that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand, walk, and sit about six hours in an eight-hour workday; frequently climb ramps and stairs, balance, stoop, and crawl; could never climb ladders, ropes, and scaffolds. He also opined that Plaintiff should avoid concentrated exposure to extreme cold, heat, humidity, and fumes and avoid all exposure to hazards. (R.pp. 99-101).

Over a year later, on April 9, 2014, Plaintiff was treated at Self Regional for complaints of lumbar back pain. He was diagnosed with low back pain and spasm of back muscles. Prednisone, Ibuprofen, and Hydrocodone were prescribed. On April 25, 2014, Dr. Toussaint listed Plaintiff's "causes for disability" as chronic pain in both shoulders with decreased range of motion following two surgeries on the left, an unresolved cardiac condition increased by exertion with angina and suspected coronary disease with pain three times a week that lasted for an hour even with Nitrostat, chronic pain of the lower back (for eight years) with sitting after thirty minutes and standing after thirty minutes, and a head injury following a car accident such that Plaintiff had little memory and did not seem to understand directions and concentration problems. (R.p. 544).

Plaintiff underwent a psychological and vocational consultative examination with Dr. Robert E. Brabham, a psychologist, on May 21, 2014. Plaintiff told Dr. Brabham that he suffered



from depression and anxiety.  Testing indicated that Plaintiff was in the low average range for intelligence, and he scored in the moderate range on the Beck Depression Inventory II test.  Dr. Brabham opined that Plaintiff had sustained a traumatic brain injury at the time of his second motor vehicle accident, and indicated Plaintiff should receive treatment for depression.  He stated that after observing Plaintiff and reviewing records of Plaintiff's past behavior and levels of functioning, that Plaintiff was manifesting signs and symptoms consistent with the requirements to establish several diagnoses.  Specifically, Dr. Brabham diagnosed Plaintiff with pain disorder, depressive disorder, generalized anxiety disorder, and cognitive disorder due to a traumatic brain injury.  His diagnosis was based in part on Plaintiff's self-reported difficulty with memory, judgment, attention, concentration, multitasking, organization, and initiation.  Dr. Brabham opined that Plaintiff had marked restrictions in his activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration and persistence.  He further opined that Plaintiff met the criteria for Social Security Listing of Impairments at § 12.04 (affective disorder),[2] and concluded that Plaintiff could not sustain gainful employment.

Dr. Brabham thought that Plaintiff's limitations on the use of his upper extremity (although he refers to Plaintiff's right upper extremity rather than his injured left upper extremity) provided further limitations and that Plaintiff was unable to maintain any position for more than a brief time (less than thirty minutes) and would frequently have to change position.  He also opined

---

[2]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results."  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  A claimant is presumed to be disabled if his or her impairment meets or is medically equivalent to the criteria of an impairment set forth in the Listings. See 20 C.F.R. § 416.925.  The ALJ found that Plaintiff did not have an impairment of combination of impairments that met or equaled the severity of one of the listed impairments, but there is no indication that he specifically considered whether Plaintiff met Listing 12.04.  (R.pp. 21-22).



that Plaintiff would not be able to handle any type of work that required close attention to detail, attention, concentration, persistence, or pace. Dr. Brabham concluded that the combination of Plaintiff's multiple psychological and cognitive limitations clearly resulted in an inability to sustain employment, and that Plaintiff was expected to remain permanently unable to engage in full-time gainful, competitive employment. (R.pp. 566-574).

On May 27, 2014, Dr. Toussaint completed a "Medical Statement" (which appears to have been drafted by Plaintiff's attorney at the time) in which he stated that Plaintiff's subjective symptoms were consistent with Plaintiff's diagnoses as confirmed by objective clinical and laboratory findings. Plaintiff's diagnoses included a head injury, memory loss, and poor comprehension. Dr. Toussaint answered "yes" to the question of whether Plaintiff's complaints of low back pain, shoulder pain, shortness of breath, intermittent chest pain, loss of memory, inability to concentrate since a head injury in 2011, and daytime drowsiness and fatigue from medications he had to take, occurred in combination with such frequency and severity to preclude even sedentary work on a full-time, forty-hour per week basis. Dr. Toussaint also wrote that the primary objective clinical and laboratory findings that supported Plaintiff's symptoms were chronic back pain, and opined that Plaintiff would not be able to perform sedentary work on a full-time sustained basis for eight hours a day forty hours a week. Additionally, Dr. Toussaint estimated that Plaintiff would be absent from work for more than four days a month based on his impairments, his credible subjective symptoms, and the treatment required for those symptoms. (R.pp. 563-564).

## Discussion

Plaintiff was forty years old at the time he alleges he became disabled, and forty-three years old at the time of the ALJ's decision. He has a high school education and has past relevant

11



work experience as a truck driver and a mental retardation specialist.  (R.pp. 24, 25, 173, 198, 230).

In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must

show that he has an impairment or combination of impairments which prevent him from engaging

in all substantial gainful activity for which he is qualified by his age, education, experience, and

functional capacity, and which has lasted or could reasonably be expected to last for a continuous

period of not less than twelve (12) months.

       After a review of the evidence and testimony in the case, the ALJ determined that,

although Plaintiff does suffer from the "severe" impairments[3] of cervical degenerative disc disease

(DDD) with left radiculopathy, residual effects of left shoulder SLAP repair and left distal clavicle

resection, ulnar and median nerve neuropathy, angina, hypertension, and bullous lung disease (R.p.

17), he nevertheless retained the residual functional capacity (RFC) to perform light work[4] limited

to only frequent push/pull and use hand/foot controls; never climbing ladders, ropes, or scaffolds;

frequently climbing ramps and stairs, balance, stoop, crouch, kneel, and crawl; frequently performing

overhead reaching on the left; frequently performing handling and fingering with his dominant left

hand; limited to occasional exposure to extreme cold, extreme heat, humidity, and pulmonary irritants

(such as odors, fumes, dusts, gasses, and poor ventilation); and avoidance of all exposure to hazards

associated with unprotected dangerous machinery or unprotected heights.  The ALJ also found that

---

[3]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to
do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142
(1987).

[4]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job
is in this category when it requires a good deal of walking or standing, or when it involves sitting
most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).



Plaintiff was limited to simple, routine repetitive tasks performed in a low stress work environment, which he defined as being free of fast-paced and team dependent production requirements, involving only simple work-related decisions, and involving less-than occasional (if any) work place changes. (R.p. 22). At step four, the ALJ found that Plaintiff could not perform any of his past relevant work with these limitations. (R.p. 24). However, after obtaining testimony from a vocational expert, he found at step five that Plaintiff could perform jobs existing in significant numbers in the national economy with these limitations, and was therefore not disabled during the time period at issue. (R.pp. 25-26).

Plaintiff asserts that in reaching this decision, the ALJ erred because he failed to explain his findings regarding Plaintiff's RFC as required by SSR 96-8p, failed to consider significant evidence related to Plaintiff's radiculopathy and neuropathy, failed to properly assess the medical opinions of treating physician Dr. Toussaint and consulting psychologist Dr. Brabham, and failed to properly evaluate Plaintiff's credibility. After careful review and consideration of the evidence and arguments presented, the undersigned is constrained to agree with Plaintiff that the ALJ failed to fully evaluate the opinion evidence, thereby requiring a remand of this case for additional review.

Dr. Toussaint is a treating physician (the ALJ noted that Dr. Toussaint treated Plaintiff for more than fifteen years, managed many of Plaintiff's complaints with prescription medications, and had examined Plaintiff on a regular basis since 2012 - R.pp. 18-19). Dr. Toussaint provided opinions of disability in April and May 2014, and a treating physician's opinion is ordinarily entitled to great weight; Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Noting importance of treating physician opinion]; is entitled to deference, and must be weighed using all of the factors provided for in 20 C.F.R. §§ 404.1527 and 416.927. See SSR 96-2p. Under these regulations, a treating source's



13

opinion on the nature and severity of an impairment is entitled to "controlling weight" where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. Further, the ALJ is required to provide an explanation in the decision for what weight is given a treating source's opinion and, if rejected, why it was rejected. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

Here, the ALJ discussed Dr. Toussaint's May 2014 medical source statement, but only gave this opinion "minimal" weight because he found that it was "not well supported by acceptable clinical and diagnostic techniques demonstrating the degree of limitation assessed by Dr. Toussaint" and because "contradictory evidence within the record either contradicts or fails to support the doctor's assessment." (R.p. 19). However, the ALJ also stated that Dr. Toussaint's "treatment notes are consistent with his objective findings" (R.p. 19), a conclusion which would seem to contradict his decision to discount Dr. Toussaint's opinion. Further, even if this is a typographical error and the ALJ meant to say that the notes were *not* consistent, he then failed to explain how the treatment notes are inconsistent with Dr. Toussaint's conclusions. While the ALJ found that Plaintiff did not have any mental impairments, in his treatment notes from April 25, 2014, Dr. Toussaint wrote that as a result of Plaintiff's head injury, he has little memory and seemed not to understand directions.[5] (R.p. 544). He also diagnosed Plaintiff with a "brain injury [resulting in] severe decrease of concentration". (R.p. 545). However, the ALJ does not discuss at all Dr. Toussaint's earlier April 2014 opinions, or explain why they were rejected. Cotter v. Harris, 642 F.2d 700 (3rd Cir. 1981)

---

[5]A finding supported by Plaintiff's mother at the hearing, where she testified that Plaintiff had difficulty remembering recent conversations. However, the ALJ (noting that she was not a medical professional and had a financial interest in seeing that Plaintiff obtained benefits) gave only "slight" weight to her testimony. (R.p. 20).



[listing cases remanded because of failure to provide explanation or reason for rejecting or not addressing relevant probative evidence].

The Commissioner appears to argue that the ALJ's failure to address Dr. Toussaint's April 2014 opinions is harmless because the opinions do not indicate the presence of objective medical testing, but merely recount Plaintiff's subjective self-reported symptoms, they do not indicate that Dr. Toussaint performed any testing, and that in any event Dr. Toussaint's opinion of disability is not entitled to controlling weight because it is an issue reserved to the Commissioner (20 C.F.R. § 404.1527(d)(1)). <u>Commissioner's Brief</u>, ECF No. 14 at 17. However, these arguments are at this point only post hoc rationalization by the Commissioner for upholding the decision, since none of these findings or conclusions were made, or explained by, the ALJ in the decision itself as a basis for his not accepting, or even considering, Dr. Toussaint's earlier findings or opinions. <u>See Salvador v. Sullivan</u>, 917 F.2d 13, 15 (9th Cir. 1990) ["Implicit" rejection of treating physician's opinion cannot satisfy Administration's obligation to set forth "specific, legitimate reasons" for rejecting a treating physician's opinion]; <u>see</u> <u>also</u> <u>Ellis v. Astrue</u>, No. 07–3996, 2009 WL 578539, at * 8 (D.S.C. Mar. 5, 2009) [Rejecting post hoc rationale for ALJ's decision]; <u>Nester v. Astrue</u>, No. 08–2045, 2009 WL 349701, at * 2 (E.D. Feb. 12, 2009) [Noting that the Court "may not consider post hoc rationalizations but must evaluate only the reasons and conclusions offered by the ALJ."]; <u>Pinto v. Massanari</u>, 249 F.3d 840, 847 (9th Cir. 2001)[Court cannot affirm a decision on a ground that the ALJ did not himself invoke in making the decision] .

Additionally, because the ALJ failed to consider Dr. Toussaint's April 2014 opinions and diagnosis, the undersigned in unable to find that the ALJ's decision to discount Dr. Brabham's opinion is supported by substantial evidence. The ALJ discounted Dr. Brabham's opinion, giving



it "limited" weight, because Dr. Brabham was a non-treating examiner, the report was specifically prepared for litigation upon the attorney's request, and the ALJ found that Dr. Brabham was not provided all relevant reports and in particular was not given reports involving Plaintiff's head injuries and negative CT scan results.  However, although Plaintiff's attorney at the hearing (Plaintiff is currently represented by a different attorney) stated Dr. Brabham did not receive copies of Plaintiff's CT scans (R.p. 37), Plaintiff's current counsel notes that Dr. Brabham's report indicated he had reviewed the records from Self Regional  (R.p. 567).  Dr. Brabham also specifically referenced Dr. Toussaint's records as one of his sources of information; (R.p. 567); and Dr. Toussaint's April 2014 opinion, in which he listed one of Plaintiff's causes for disability as a head injury such that Plaintiff had little memory and did not seem to understand directions and had concentration issues (R.p. 544), supports Dr. Brabham's opinion.

        The ALJ also discounted Dr. Brabham's opinion by stating that "the fact that no treating physician [] found cognitive symptoms significant enough to request a brain MRI further minimizes the strength of Dr. Brabham's opinion." (R.pp. 19-20).  However, that finding is also incorrect, as on April 25, 2014 (the same day he opined as to Plaintiff's causes for disability), Dr. Toussaint ordered an MRI of Plaintiff's brain, and wrote "DX brain injury where decrease of concentration." (R.p. 545).  Additionally, although the Commissioner argues that the ALJ properly discounted Dr. Brabham's opinion because the record is devoid of objective medical evidence that Plaintiff experiences psychological symptoms consistent with an affective disorder, and while it may be that there is evidence that Plaintiff's affective disorder does not limit him to the extent found by



Dr. Brabham, there is evidence of depression, including the results of the Beck Depression Inventory, which was consistent with a moderate level of depression. (R.p. 571).[6]

   Even though Dr. Brabham was not a treating physician, his opinion and those of treating physician Dr. Toussaint are the only evaluations of Plaintiff's mental impairments in the record. While the ALJ did also consider the opinions of the state agency physicians (from February and December 2012), giving little weight to one opinion and only some weight to the other, these state agency physician opinions do not appear to address or evaluate any mental assessments, such that it is unclear how the ALJ arrived at his conclusion concerning Plaintiff's mental RFC (which contradicts the opinions of Dr. Toussaint and Dr. Brabham). Moreover, the ALJ incorrectly states (as part of the rationale for his decision) that "there is no evidence that any physician has placed any limitations on [Plaintiff's] ability to work" (R.p. 24), even though Dr. Toussant and Dr. Brabham both specifically opined that Plaintiff's symptoms and limitations would prevent him from performing even sedentary work. (R.pp. 563, 572-573). Therefore, the ALJ failed to properly review and evaluate this opinion evidence, requiring remand. <u>Cotter</u>, 642 F.2d 700 [listing cases remanded because of failure to provide explanation or reason for rejecting or not addressing relevant probative evidence]; <u>Bray v. Commissioner of Social Security Admin.</u>, 554 F.3d 1219, 1225 (9th Cir. 2009)["Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ - not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."].

---

  [6]The ALJ himself noted there were references in the record to depression, although he concluded that no functional limitations were established as to depression. (R.pp. 20).



Plaintiff also argues that the ALJ failed to explain his findings regarding Plaintiff's RFC as required by SSR 96-8p, and in particular that the ALJ failed to consider significant evidence related to Plaintiff's radiculopathy and neuropathy including the EMG findings and the positive Tinel and Phalen signs indicative of carpal tunnel syndrome. RFC is defined as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). In SSR 96-8p, RFC is defined as a function-by-function assessment of an individual's physical and mental capacities to do sustained, work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours per day, five days per week, or the equivalent. SSR 96-8p, 1996 WL 374184. An RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations);" Id. at *7; and "[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir.2015), citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013); see also, e.g., Neely v. Comm'r of Soc. Sec., No. 1:14–cv–01109–TLW, 2015 WL 3536690, at *12 (D.S.C. June 4, 2015); Washington v. Colvin, No. 1:14–cv–2415–BHH, 2015 WL 3868063, at *29 (D.S.C. June 23, 2015).

In this case, the ALJ set out his RFC findings at the beginning of finding number 5 (R.p. 22), but a reading of the remainder of this section fails to reveal how the ALJ reached this conclusion. The Commissioner argues that the ALJ made a proper RFC determination because he discussed medical evidence in his step two determination (as to severe impairments) and his step three determination that Plaintiff's neuropathy failed to meet or equal a Listing. However, it is not



clear that the ALJ considered the results of Plaintiff's EMG testing and the findings of evidence of carpal tunnel syndrome, as this objective medical evidence is not specifically discussed in his decision, nor is (as discussed, supra) a proper evaluation made of Plaintiff mental impairment (or lack thereof) or explanation provided for Plaintiff's limitation to simple, routine tasks when no mental limitation was found.  As such, the ALJ failed to "build an accurate and logical bridge from the evidence to his conclusion." Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016)(quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).  Thus, this action should be remanded for the ALJ to determine Plaintiff's RFC in light of all the evidence and applicable law.  See Mascio, 780 F.3d at 637 [a reviewing court cannot be "left to guess about how the ALJ arrived at his conclusions"]; see also Monroe v. Colvin, 826 F.3d 176, 188 (4th Cir. 2016)[stating remand may be appropriate where "inadequacies in the ALJ's analysis frustrate meaningful review."].

   With respect to the remainder of Plaintiff's claims of error, the ALJ will be able to reconsider and re-evaluate the evidence in toto as part of the reconsideration of this claim.  Hancock v. Barnhart, 206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted de novo].

### Conclusion

   Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence 4 of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for re-evaluation of the evidence as set forth hereinabove, and for such further administration action as may be necessary.  See Shalala v. Schaefer, 509 U.S. 292 (1993).



The parties are referred to the notice page attached hereto.



_____
Bristow Marchant
United States Magistrate Judge

March 8, 2017
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

